Filed 2/27/13  P. v. Xiong CA5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | F063938 |
| v. | (Super. Ct. No. F11901181) |
| CHOR XIONG, | **O P I N I O N** |
| Defendant and Appellant. | |

### THE COURT*

APPEAL from a judgment of the Superior Court of Fresno County.  Edward Sarkisian, Jr., Judge.

John L. Staley, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Kathleen A. McKenna and Rebecca Whitfield, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

* Before Levy, Acting P.J., Kane, J., and Poochigian, J.

A jury convicted appellant, Chor Xiong, of the unlawful taking or driving of a motor vehicle (Veh. Code, § 10851, subd. (a)), and in two separate proceedings, appellant admitted allegations that he had suffered a "strike,"[1] served two separate prison terms for prior felony convictions (Pen. Code, § 667.5, subd. (b))[2], and suffered a prior conviction of violating Vehicle Code section 10851 (Veh. Code, § 10851, subd. (e)).  The court imposed a prison term of 10 years, consisting of the four-year upper term on the substantive offense, doubled pursuant to the three strikes law (§§ 667, subd. (e)(1); 1170.12, subd. (c)(1)), for a total of eight years, and one year on each of the two prior prison term enhancements.  The court awarded appellant presentence custody credits of 415 days, consisting of 277 days of actual custody credits and 138 days of conduct credits.

On appeal, appellant contends the court erred in failing to (1) award him presentence conduct credits under the one-for-one credit scheme of the current iteration of section 4019; (2) conduct an adequate inquiry to determine if appellant needed the assistance of an interpreter; and (3) appoint an interpreter.  We affirm.

### DISCUSSION

*Denial of Request for Appointment of an Interpreter*

Prior to the commencement of trial testimony, appellant requested the appointment of an interpreter.  The court denied the request.  Appellant contends the court abused its discretion in failing to appoint an interpreter, in violation of his rights under the United States and California Constitutions.

---

[1]     We use the term "strike" as a synonym for "prior felony conviction" within the meaning of the "three strikes" law (§§ 667, subds. (b)-(i); 1170.12), i.e., a prior felony conviction or juvenile adjudication that subjects a defendant to the increased punishment specified in the three strikes law.

[2]     Unless otherwise indicated, all further statutory references are to the Penal Code.

*Background*

At the outset of trial proceedings, before any testimony was taken, the prosecutor informed the court that "[Defense counsel] advised Presiding this morning that her client wanted the services of a Hmong interpreter." The court stated it was aware of appellant's request for an interpreter, and noted "that there's been 13 minute orders up to today's date, none of which included or noted the assistance of an interpreter, as well as the preliminary hearing." Defense counsel did not dispute this, and confirmed that she and appellant had been communicating without the assistance of an interpreter "throughout," at which point the following colloquy occurred:

"THE COURT: ... [¶] So is there anything else you wish to add for the record in terms of that request?

"[Defense counsel]: Just before the trial [appellant] asked if he could have a Hmong interpreter so he would better understand what was going on at trial.

"THE COURT: And it is correct that an interpreter hasn't been utilized up to this point throughout the case?

"[Defense counsel]: That is correct.

"THE COURT: ... So at this point all I've had is a request standing alone.

"[Defense counsel]: Yes, Your Honor."

At that point, the court stated it was "not inclined" to grant the request, and stated: "So unless there's something else that is brought to the Court's attention I'm not persuaded an interpreter is going to be appointed." Defense counsel responded, "I understand," and the court moved to a discussion of other matters.

*Analysis*

Under the California Constitution, "A person unable to understand English who is charged with a crime has a right to an interpreter throughout the proceedings." (Cal. Const., art. I, § 14.) In addition, various rights under the United States Constitution,

3

"includ[ing] the right of a defendant to due process, to confrontation, to effective assistance of counsel, and to be present at trial" "may be implicated in the right to an interpreter." (*People v. Rodriguez* (1986) 42 Cal.3d 1005, 1011.) "Regarding the rights to effective assistance of counsel and to effective presence at trial, courts frequently have echoed the words of the United States Supreme Court that a criminal defendant must possess 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding.'" (*People v. Carreon* (1984) 151 Cal.App.3d 559, 567 (*Carreon*), quoting *Dusky v. United States* (1960) 362 U.S. 402.)

A court is not required to appoint an interpreter merely because a defendant requests or demands one. (*In re Raymundo* (1988) 203 Cal.App.3d 1447, 452-1453 (*Raymundo*).) Rather, "an affirmative showing of need is required." (*Id*. at p. 1453.) As this court explained in *Carreon*, *supra*, 151 Cal.App.3d at pp. 566-567: "Prior to enactment of this constitutional provision [art. I, § 14], courts had developed the rule that upon the defendant's showing of necessity, appointment of an interpreter was required as a matter of due process. [¶] In the past, trial courts had been afforded broad discretion in determining whether a defendant's comprehension of English was minimal enough to render interpreter services 'necessary.' [Citations.] Nothing in the new constitutional provision changes this well established requirement of a finding of necessity by the trial court. Indeed, the provision specifically states that the right to an interpreter is contingent upon a person's being 'unable to understand English.' (Cal. Const., art. I, § 14.) Prior to the right being spelled out in the state Constitution, the court's failure to appoint an interpreter upon a proper showing of need was deemed violative of fundamental fairness and sometimes required reversal of the defendant's conviction. [Citation.]" Thus, "the burden is on the accused to show that his [or her] understanding of English is not sufficient to allow him [or her] to understand the nature of the proceedings and to intelligently participate in his defense." (*Raymundo*, at p. 1454.)

4

The denial of a request for an interpreter is reviewed for abuse of discretion. (*Raymundo*, *supra*, 203 Cal.App.3d at p. 1456.) "An exercise of discretion by a trial judge may be reversed ""where no reasonable basis for the action is shown.'"" [Citation.] ""[W]here a trial court has discretionary power to decide an issue, a reviewing court will not disturb that decision unless the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination....'"" [Citation]" (*Ibid*.)

"When evaluating a determination as to the necessity of appointing an interpreter, the policy of upholding a lower court's decision based upon informed discretion is strong. The trial judge is in a unique position to evaluate the reactions and responses of the accused and to determine whether he or she does or does not require an interpreter in order to be adequately understood or in order to adequately understand the proceedings. This exercise of discretion should not be reversed unless there is a complete lack of any evidence in the record that the accused does understand English, thereby rendering the decision totally arbitrary." (*Raymundo*, *supra*, 203 Cal.App.3d at p. 1456.)

Here, as indicated earlier, appellant, at the hearing on his request for an interpreter, made virtually no showing of a need for an interpreter. The sum total of the defense showing was defense counsel's statement that appellant "[had] asked if he could have a Hmong interpreter so he would better understand what was going on at trial." Counsel confirmed that the court had before it only "a request standing alone." We recognize that "the fact that [a criminal defendant] states that he does not understand English and requests an interpreter on that basis may be some evidence of the fact that the charged individual does not understand English...." (*Raymundo*, *supra*, 203 Cal.App.3d at p. 1453.) However, such a claim and request "cannot be considered conclusive proof of that lack of proficiency in English" (*ibid*.) and does not, without more, necessitate the appointment of an interpreter (*id*. at pp. 1452-1453). Moreover, defense counsel

5

confirmed that she and appellant had communicated at all times without an interpreter, and appellant did not dispute below, and does not dispute now on appeal, the court's finding that in 13 previous court appearances appellant had not required the services of an interpreter. (See *Raymundo*, *supra*, 203 Cal.App.3d at p. 1455 [factors relevant to determination of need for interpreter include whether one has previously been provided].) The court's determination that appellant had not made the requisite showing of need for an interpreter was well within the court's discretion.

Appellant's challenge to the court's denial of his request for an interpreter focuses on how poor a defendant's understanding of English must be to necessitate the appointment of an interpreter. He argues that "even a *slight inability* of a defendant to understand court proceedings because of a limitation on his or her ability to speak English warrants the appointment of an interpreter." (Italics added.) Indeed, appellant suggests that a defendant has a constitutional right to an interpreter unless he or she is able to "understand every word throughout [the] judicial proceedings." Further, appellant suggests, he made the required showing below and therefore the court abused its discretion in denying his request for an interpreter. These claims are without merit.

First, the authorities cited by appellant in this regard are inapposite. He points to *U.S. ex. rel. Negron v. New York* (2d Cir. 1970) 434 F.2d 386 (*Negron*) and *People v. Aguilar* (1984) 35 Cal.3d 785 (*Aguilar*). In *Negron*, as our Supreme Court explained in *Aguilar*, "the appellate court found constitutional error in the failure of the trial court to provide a Spanish speaking defendant with an interpreter notwithstanding the fact that a prosecution interpreter provided the accused with periodic summaries of the proceedings." (*Aguilar*, at p. 792.) In the portion of *Negron* on which appellant relies, which, as appellant notes, the court in *Aguilar* cited with approval, the court stated: "'[i]n order to afford Negron his right to confrontation, it was necessary under the circumstances that he be provided with a simultaneous translation of what was being said

6

for the purpose of communicating with his attorney to enable the latter to effectively cross-examine those English-speaking witnesses to test their credibility, their memory and their accuracy of observation in light of Negron's version of the facts.'" (*Aguilar*, at pp. 792-793, quoting *Negron*.) However, the quoted portion of *Negron* upon which appellant relies merely states what was constitutionally required where *it had been established* that the Spanish-speaking defendant "was unable to communicate with his counsel without the use of an interpreter." (*Aguilar*, at p. 792.) It says nothing about what was required to establish that the defendant lacked the ability to communicate in English, and certainly does not suggest that no more than a slight inability to understand English is sufficient to trigger the requirement that an interpreter be appointed.

Moreover, given appellant's failure below to do more than simply request an interpreter, in our view, he failed to establish he had even a slight inability to understand English. Finally, and more fundamentally, the "slight inability" standard appellant proposes is contrary to the principle, discussed above, that a defendant has no constitutional right to an interpreter unless he or she lacks the "'ability to consult with his [or her] lawyer with a *reasonable degree* of rational understanding.'" (*Carreon*, *supra*, 151 Cal.App.3d at p. 567, italics added.) The requirement, as articulated in *Raymundo*, that "the burden is on the accused to show that his [or her] understanding of English is not sufficient to allow him [or her] to understand the nature of the proceedings and to intelligently participate in his defense" (*Raymundo*, *supra*, 203 Cal.App.3d at p. 1454), is consistent with this standard. Under this standard, the denial of appellant's request for an interpreter did not constitute an abuse of discretion.

### *Inquiry into Need for an Interpreter*

Appellant argues as follows: "[T]he trial court failed to conduct any meaningful dialogue with appellant to determine why he needed an interpreter. The trial court should have, at a minimum, determined how long appellant had been speaking English, his

7

native language, and what portion of the proceedings he had failed to understand.  The trial court's failure to conduct this inquiry was error."

Here, as indicated earlier, the record shows the following:  after being informed by the prosecutor that defense counsel had earlier indicated that appellant wanted an interpreter, the court invited counsel to place on the record the reasons for that request.  Counsel stated only that appellant wanted an interpreter "so he would better understand what was going on at trial."  The court, through inquiry, established that appellant and counsel were able to communicate in English, and stated, without contradiction, that numerous previous proceedings had been conducted without an interpreter.  The court then indicated that although a request had been made, no reasons had been offered.  Counsel confirmed this.

Thus, the court afforded the defense an adequate opportunity to explain why an interpreter should be appointed, and no explanation was forthcoming.  On this record, the court cannot be faulted for not inquiring further.

***Presentence Custody Credits***

Under section 2900.5, a person sentenced to state prison for criminal conduct is entitled to presentence custody credits for all days spent in custody before sentencing.  (§ 2900.5, subd. (a).)  In addition, section 4019 provides for what are commonly called conduct credits, i.e., credits against a prison sentence for willingness to perform assigned labor (§ 4019, subd. (b)) and compliance with rules and regulations (§ 4019, subd. (c)).  (*People v. Dieck* (2009) 46 Cal.4th 934, 939, fn. 3.)

Section 4019 has undergone numerous amendments in the past few years.  Under the version in effect prior to January 25, 1010, six days would be deemed to have been served for every four days spent in actual custody—a ratio of one day of conduct credit for every two days served (one-for-two credits).  (Former § 4019, subd. (f), as amended by Stats. 1982, ch. 1234, § 7, pp. 4553-4554.)  Effective January 25, 2010, the

Legislature amended section 4019 to provide for two days of conduct credit for every two days served—one-for-one credits—for certain defendants. (Stats. 2009, 3d Ex. Sess. 2009-2010, ch. 28, § 50.) Effective September 28, 2010, the Legislature again amended section 4019, this time to restore the less generous one-for-two credits for defendants confined for crimes committed on or after September 28, 2010. (Stats. 2010, ch. 426, § 2.)

The Legislature next amended section 4019 in Assembly Bill No. 109 (2011-2012 Reg. Sess.), which was part of the so-called criminal realignment legislation. "[T]he overall purpose of [this legislation] is to reduce recidivism and improve public safety, while at the same time reducing corrections and related criminal justice spending." (*People v. Cruz* (2012) 207 Cal.App.4th 664, 679.) Under the new legislation, to which we refer as the 2011 amendment, defendants, including those who had been precluded from enhanced credits under the January 25, 2010, amendment, can receive one-for-one credits. (§ 4019, subds. (b), (c), as amended by Stats. 2011, ch. 15, § 482.) The legislation expressly provided that this change "shall apply prospectively and shall apply to prisoners who are confined to a county jail, city jail, industrial farm, or road camp for a crime committed on or after October 1, 2011. Any days earned by a prisoner prior to October 1, 2011, shall be calculated at the rate required by the prior law." (§ 4019, subd. (h), as added by Stats. 2011, ch. 15, § 482 and amended by Stats. 2011, ch. 39, § 53.)

Appellant committed the instant offense on March 1, 2011, approximately seven months prior to the effective date of the 2011 amendment. He acknowledges that his award of custody credits is governed by the one-for-two scheme of the version of section 4019 that became effective September 28, 2010, and further, that under this statute, the trial court's award of conduct credits was correct. He argues, however, that under equal protection principles, he is entitled to one-for-one credits under the 2011 amendment.

9

Specifically, appellant contends the 2011 amendment created "two classes of prison inmates and parolees," viz., "(1) those who receive additional conduct credits since they committed a crime on or after October 1, 2011; and (2) those who will not receive additional conduct credits since they committed a crime before October 1, 2011." These two groups, he argues, relying in large part on *In re Kapperman* (1974) 11 Cal.3d 542 (*Kapperman*), are "similarly situated with respect to the purpose of the enhanced credit entitlement." Further, appellant, a member of the second group, argues that there is no "rational basis" for denying him the enhanced credits under the current version of section 4019 for the sole reason that he committed his crimes prior to October 1, 2011, and that therefore he was denied his constitutional guarantee of equal protection of the laws. This "denial of equal protection," he contends, should be remedied by modifying the judgment to award him one-for-one credits of 277 days under the 2011 amendment to section 4019 for his entire period of presentence confinement—March 1, 2011, through the date of sentencing, December 2, 2011—rather than the one-for-two credits of 138 days awarded by the court under the version of section 4019 effective September 28, 2010. We disagree.

"The concept of equal protection recognizes that persons who are similarly situated with respect to a law's legitimate purposes must be treated equally. [Citation.] Accordingly, '"[t]he first prerequisite to a meritorious claim under the equal protection clause is a showing that the state has adopted a classification that affects two or more *similarly situated* groups in an unequal manner."' [Citation.] 'This initial inquiry is not whether persons are similarly situated for all purposes, but "whether they are similarly situated for purposes of the law challenged."'" (*People v. Brown* (2012) 54 Cal.4th 314, 328 (*Brown*).) "If the first prerequisite is satisfied, we proceed to judicial scrutiny of the classification." (*People v. Rajanayagam* (2012) 211 Cal.App.4th 42, 53 (*Rajanayagam*).) As the court in *Rajanayagam* stated in addressing an equal protection challenge to the

10

2011 amendment, "Where, as here, the statutory distinction at issue neither touches upon fundamental interests nor is based on gender, there is no equal protection violation if the challenged classification bears a rational relationship to a legitimate state purpose." (*Ibid.*) "Under the rational relationship test, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification. [Citation.]" (*Ibid.*)

We first consider the question of whether appellant, who committed the instant offenses prior to October 1, 2011, and persons who were confined for offenses for crimes committed after that date are similarly situated with respect to the purpose of the law. Preliminarily, we note that appellant's period of presentence custody— March 1, 2011, through December 2, 2011—encompasses time both before, on and after October 1. As we explain below, the analysis with respect to time before October 1 and time on or after October 1 may be different.

In *Brown*, *supra*, 54 Cal.4th 314, which was decided after appellant filed his opening brief, our Supreme Court addressed whether the amendment to section 4019 that became operative on January 25, 2010, should be given retroactive effect to permit prisoners, who served time in local custody before that date, to earn conduct credits at the increased rate. Addressing the issue of whether defendant was similarly situated to those defendants who served time after the operative date, and rejecting *Kapperman*-based arguments, the court explained: "As we have already explained, the important correctional purposes of a statute authorizing incentives for good behavior [citation] are not served by rewarding prisoners who served time before the incentives took effect and thus could not have modified their behavior in response. That prisoners who served time before and after former section 4019 took effect are not similarly situated necessarily follows." (*Brown*, at pp. 328–329.)

11

Relying on *Brown*, this court, in *People v. Ellis* (2012) 207 Cal.App.4th 1546 (*Ellis*), rejected an equal protection challenge to the 2011 amendment virtually identical to that raised by appellant here: "We can find no reason *Brown's* conclusions and holding with respect to the January 25, 2010, amendment should not apply with equal force to the October 1, 2011, amendment. [Citation.] Accordingly, we reject defendant's claim he is entitled to earn conduct credits at the enhanced rate provided by current section 4019 for the entire period of his presentence incarceration."[3] (*Ellis*, at p. 1552; accord, *People v. Kennedy* (2012) 209 Cal.App.4th 385, 396-397 (*Kennedy*).)

After *Ellis* was decided, the court in *Rajanayagam*, *supra*, 211 Cal.App.4th 42, addressed an equal protection challenge to the current version section 4019, where, as in *Ellis* and the instant case, the confinement period straddled October 1. However, the defendant in *Rajanayagam* effectively conceded he was not entitled to the portion of his presentence confinement that predated October 1, and therefore the defendant's claim related only to time served on and after that date. The court held that the two groups in question—"(1) those defendants who are in jail on and/or after October 1, 2011, who committed an offense on or after October 1, 2011, and (2) those defendants who are in jail on and/or after October 1, 2011, who committed the same offense *before* October 1, 2011"—were "similarly situated for purposes of the October 1, 2011, amendment ...." (*Rajanayagam*, at p. 53.) *Brown*, the court stated, "is inapposite on this point." (*Rajanayagam*, at p. 54.) The court reasoned as follows: "[*Brown*] did not involve a situation where a defendant sought enhanced conduct credit for time served after the amendment's operative date. Instead, *Brown* concerned whether the amendment was retroactive, i.e., whether a defendant who served time before the operative date was

---

**3** Like appellant, the defendant in *Ellis* was confined prior to sentencing both before, on and after October 1.

12

entitled to enhanced conduct credits. Here, we are faced with the issue of whether the current version of section 4019 operates prospectively as to a defendant who committed an offense before the amendment's effective date. We read the language of *Brown*, *supra*, 54 Cal.4th at page 329, '[t]hat prisoners who served time before and after former section 4019 took effect are not similarly situated necessarily follows' as limited to the facts in that case—that there is no incentive for defendants who served time before the amendment's effective date to work and behave. *Brown* is not instructive on the issue of whether there is an incentive for defendants who served time after the amendment's effective date to work and behave." (*Ibid*.)

This court in *Ellis*, in finding *Brown* controlling, did not specifically address the foregoing view of the *Brown* equal protection analysis of confinement time *on and after October 1*. However, we need not reconsider this court's conclusion in *Ellis* on this point. As we explain below, assuming for the sake of argument that the similarly-situated requirement is met for the entire period of appellant's custody, his equal protection claim nonetheless fails because there is a rational basis for the legislative classification at issue. On this point, we agree with *Rajanayagam* court's analysis, from which we quote at length.

"With respect to the judicial scrutiny of the classification, we must determine whether there is any reasonably conceivable state of facts that could provide a rational basis for the classification. It is undisputed the purpose of section 4019's conduct credits generally is to affect inmates' behavior by providing them with incentives to work and behave. (*Brown*, *supra*, 54 Cal.4th at pp. 327–329.) But that was not the purpose of Assembly Bill No. 109, which was part of the Realignment Act.... [T]he Legislature's stated purpose for the Realignment Act 'is to reduce recidivism and improve public safety, while at the same time reducing corrections and related criminal justice spending.' [Citation.] Section 17.5, subdivision (a)(7), puts it succinctly: 'The purpose of justice

13

reinvestment is to manage and allocate criminal justice populations more *cost-effectively*, generating savings that can be reinvested in evidence-based strategies that increase public safety while holding offenders accountable.' (Italics added.)" (*Rajanayagam*, *supra*, 211 Cal.App.4th at pp. 54-55.)

Thus, we must determine whether the 2011 amendment to section 4019 awarding less credits to those defendants who committed their offenses before October 1, than those defendants who committed their offenses on or after October 1, "bears a rational relationship to the Legislature's legitimate state purpose of reducing costs." (*Rajanayagam*, *supra*, 211 Cal.App.4th at p. 55.) "We are mindful the rational relationship test is highly deferential. (*People v. Turnage* (2012) 55 Cal.4th 62, 77 ['[w]hen conducting rational basis review, we must accept any gross generalizations and rough accommodations that the Legislature seems to have made. A classification is not arbitrary or irrational simply because there is an "imperfect fit between means and ends"'].)" (*Ibid*.)

As did the court in *Rajanayagam*, "We conclude the classification in question does bear a rational relationship to cost savings." (*Rajanayagam*, *supra*, 211 Cal.App.4th at p. 55.) "Preliminarily, we note the California Supreme Court has stated equal protection of the laws does not forbid statutes and statutory amendments to have a beginning and to discriminate between rights of an earlier and later time. (*People v. Floyd* (2003) 31 Cal.4th 179, 188 (*Floyd*) ['[d]efendant has not cited a single case, in this state or any other, that recognizes an equal protection violation arising from the timing of the effective date of a statute lessening the punishment for a particular offense'].) Although *Floyd* concerned punishment, we discern no basis for concluding differently here." (*Ibid*.; accord, *Kennedy*, *supra*, 209 Cal.App.4th at pp. 398-399 ["Although [the 2011 amendment] does not ameliorate punishment for a particular offense, it does, in effect, ameliorate punishment for all offenses committed after a particular date"].)

14

"More importantly, in choosing October 1, 2011, as the effective date of Assembly Bill No. 109, the Legislature took a measured approach and balanced the goal of cost savings against public safety. The effective date was a legislative determination that its stated goal of reducing corrections costs was best served by granting enhanced conduct credits to those defendants who committed their offenses on or after October 1, 2011. To be sure, awarding enhanced conduct credits to everyone in local confinement would have certainly resulted in greater cost savings than awarding enhanced conduct credits to only those defendants who commit an offense on or after the amendment's effective date. But that is not the approach the Legislature chose in balancing public safety against cost savings. (*Floyd*, *supra*, 31 Cal.4th at p. 190 [Legislature's public purpose predominate consideration].) Under the very deferential rational relationship test, we will not second-guess the Legislature and conclude its stated purpose is better served by increasing the group of defendants who are entitled to enhanced conduct credits when the Legislature has determined the fiscal crisis is best ameliorated by awarding enhanced conduct credit to only those defendants who committed their offenses on or after October 1, 2011." (*Rajanayagam*, *supra*, 211 Cal.App.4th at pp. 55-56; accord, *Kennedy*, *supra*, 209 Cal.App.4th at p. 399 [in making changes to custody credits earning rates "the Legislature has tried to strike a delicate balance between reducing the prison population during the state's fiscal emergency and protecting public safety," and "Although such an effort may have resulted in comparable groups obtaining different credit earning results, under the rational relationship test, the Legislature is permitted to engage in piecemeal approaches to statutory schemes addressing social ills and funding services to see what works and what does not"].)

Finally, we find a second rational basis for the classification at issue. As the court stated in *Kennedy*: "[T]he Legislature could rationally have believed that by making the 2011 amendment to section 4019 have application determined by the date of the offense,

15

they were preserving the deterrent effect of the criminal law as to those crimes committed before that date.  To reward appellant with the enhanced credits of the [October] 2011 amendment to section 4019, even for time he spent in custody after October 1, 2011, weakens the deterrent effect of the law as it stood when appellant committed his crimes.  We see nothing irrational or implausible in a legislative conclusion that individuals should be punished in accordance with the sanctions and given the rewards (conduct credits) in effect at the time an offense was committed." (*Kennedy*, *supra*, 209 Cal.App.4th at p. 399.)  For the foregoing reasons, we conclude appellant's equal protection rights were not violated.

## DISPOSITION

The judgment is affirmed.

16